UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

LA QUINTA CORPORATION, et al.                                                              PLAINTIFFS

v.                                                                              CIVIL ACTION NO. 3:05CV-328-S

HEARTLAND PROPERTIES, LLC, et al.                                                     DEFENDANTS

## MEMORANDUM OPINION

      This matter is before the court on cross-motions of the parties for summary judgment. The defendants, Heartland Properties, LLC, David Adams and Betty Adams (collectively referred to herein as "Heartland"),[1] and the plaintiff, Baymont Franchising, LLC, have filed cross-motions for summary judgment on the merits of the action. (DNs 45 and 46 respectively). The plaintiff, La Quinta Corporation, has moved for summary judgment on the ground that it has been sued in error as it is merely the parent company of Baymont and not a party to the license agreement. Alternatively, it seeks summary judgment against the defendants on the same bases as asserted by Baymont, and adopts the motion and memoranda of Baymont as its own. (DN 47).

      A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty*

---

[1] David and Betty Adams are members of Heartland Properties LLC and executed a personal guarantees rider in connection with the license agreement. The claims of the Adams against the plaintiffs are coextensive with the claims of the LLC. Baymont's claims against the Adams include breach of the guarantee rider as well as wrongful use of Baymont's marks and misappropriation of trade secrets in failing to return proprietary materials after termination of the license agreement.

*Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).  The dispute must also be genuine.  The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party.  *Id.* at 2510.  The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.  *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968).  The evidence must be construed in a light most favorable to the party opposing the motion.  *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

The action arose from the alleged breach of a franchise agreement between Baymont, and Heartland.[2]  It is undisputed that La Quinta acquired substantially all the assets of the limited service lodging division of The Marcus Corporation including the Baymont franchise system of hotels, but that La Quinta did not merge with Baymont nor did Baymont assign its rights under the license agreement to La Quinta.

In the Fall of 2004, Baymont adopted a System Standard for computerized reservations known as the L.I.S.A. System which necessitated the installation of computer hardware and software at Baymont franchise hotels.  Franchisees were required to enter into a software license agreement by which payments for the acquisition, installation, and initial training on the system were amortized over the remaining term of their franchise agreements.  "Recurring fees" for that period (which consisted of monthly royalties, marketing and reservation assessments) would be applied toward the license payments under the agreement.  In the winter of 2004, computers and support hardware for the L.I.S.A. system were sent to Heartland.  During the month of January, various training

---

[2]Heartland entered into a franchise agreement with Budgetel Franchises International, Inc., a wholly-owned subsidiary of Budgetel Inns, Inc., which was a wholly-owned subsidiary of The Marcus Corporation.  Budgetel changed its name to Baymont Franchises International, Inc.  The parties entered into the agreement in March of 1994, and amendments to the agreement in October of 2001 and September of 2003.  The October 2001 and September 2003 amendments reference Baymont as the licensor.

opportunities were made available to franchisees. Heartland did not participate, nor did it sign the license agreement.

>Heartland was notified by letter dated February 24, 2005 that it was

>...in default under Article 5 and Article 7 of your License Agreement due to your failure to execute the L.I.S.A. Software License Agreement and install for complete use at your Inn the L.I.S.A. software and all associated hardware (the "System"). The complete use and installation of the System has been determined to be the Reservation System that will best serve the Baymont franchise system and, as such, is a Baymont System Standard. You have refused to comply with this System Standard and indicated that you will not participate in the System, as a result of which your License Agreement is hereby being placed in default.

>Pursuant to Section 13.b of your License Agreement, you must cure this default by correcting the above deficiency within thirty (30) days after your receipt of this notice...

After it attempted unsuccessfully to resolve several points of controversy with Baymont and La Quinta, Heartland was notified by letter dated March 25, 2005 that its rights under the license agreement were terminated. While there is disagreement between the parties over the status of negotiations and the level of completeness of hardware and software installation, these disputes are immaterial. There is no dispute that despite being given thirty days to cure, Heartland did not sign the L.I.S.A. System agreement or ever utilize the L.I.S.A. System.

On May 15, 2005, Heartland filed suit in the Bullitt County, Kentucky, Circuit Court alleging that Baymont and La Quinta's actions[3] caused it to be unable to fulfill its obligations under the license agreement, and seeking to forestall the forced deimaging of its hotel. Heartland's claims for breach of the license agreement and bad faith in the plaintiffs' implementation of its required L.I.S.A. System are now counterclaims in the present action, the original complaint having been removed to federal court and consolidated with an action brought by Baymont against Heartland.

Heartland contends that

---

[3] Heartland initially sued only La Quinta. Upon consolidation of the actions in this court and realignment of the parties, Heartland added Baymont.

> In this case, Baymont's actions, at the direction of LaQuinta, breached the License Agreement between Heartland and Baymont. The predecessor to Baymont entered into a License Agreement wherein Heartland was granted a non-exclusive license to operate a hotel in Shepherdsville, Kentucky. That document contained a "ten-year clause" that granted Heartland the option not to renew the License Agreement. And when Baymont submitted the Software License Agreement, it was, in effect, a proposal to modify the license agreement. And when Baymont's employees submitted the proposal to the franchisees in Nashville, they withheld from the franchisees the true cost of the L.I.S.A. systems and they never advised Heartland of the true costs. In addition, Baymont/La Quinta acted unfairly and not in good faith by pressuring Heartland to waive its termination rights. And Baymont/La Quinta acted unfairly in giving unequal treatment to certain of its franchisees who likewise objected to the costs of the L.I.S.A. system beyond the contractual termination date in their License Agreements."

Heartland Summary Judgment Mem., p. 5.[4] While Heartland urges that the adoption and implementation of the L.I.S.A. System as a System Standard for Baymont franchisees was unfair, it does not deny that it had the obligation under the license agreement to comply at its own expense with System Standards established by Baymont. *See,* Adams depo., Vol. II, pp. 117-118.

Section 5.a of the license agreement states:

...Licensee agrees, at its sole expense to comply with all such System Standards...Without limiting the foregoing:

a. <u>Changes</u>. [Baymont] shall have the right, from time to time to add, amend and/or delete System Standards, including without limitation for: ...(iv) Inn technology (including for computer hardware and software for various applications, such as rooms management, records maintenance, accounting , and budgeting); and (v) Reservation System participation (including for the purchase or lease and maintenance of terminal and telephone equipment and service, and related computer hardware and software)...

Section 7.d states:

<u>Reservation System</u>. [Baymont] shall, directly, through its affiliates and/or subcontractors, and/or by subscribing to one or more thirdy party system(s), maintain

---

[4] There is no clear argument offered by Heartland with respect to its assertion of liability against La Quinta. La Quinta has not been shown to be a party to the license agreement. As such, it can neither breach nor enforce the terms of that agreement. To the extent that Heartland contends that La Quinta "interfered" with its ability to perform under the agreement, it contends, at the same time, that its acts were the acts of "Baymont/La Quinta." It does so to assert that their acts in connection with the L.I.S.A. System constituted a breach of the licensing agreement. As the claims devolve solely into an analysis of the rights and liabilities under the license agreement, La Quinta is not a proper party to the action.

> a "Reservation System" with a distinctive national toll-free telephone access number for making reservations at System Inns, and/or such technological substitute(s) and/or supplements as [Baymont], in its sole discretion, determines will best serve the System. Licensee agrees to participate in the Reservation System...Licensee shall bear (in addition to payment of Section 9c Reservation Assessments) the Inn's telephone line connection charges, supply costs and other such expenses of meeting System Standards and participating in the Reservation System.

Heartland contends that Baymont breached the license agreement because its requirement that Heartland participate in and pay for the L.I.S.A. System hardware and software constituted an impermissible unilateral modification of the termination clause in the agreement. It argues that requiring it to sign the L.I.S.A. System License Agreement with the ten-year amortization provision essentially locked franchisees into their franchise agreement until the L.I.S.A. System was paid off. Heartland urges that this modified the termination clause because it would be required to pay any remaining balance for the unamortized portion of the L.I.S.A. System if it chose not to renew its franchise relationship with Baymont at the end of the contract period.

Section 13.a providing for termination by Heartland on the tenth anniversary of the opening of its hotel remained unaltered by the adoption of the L.I.S.A. System and its attendant financial requirements. In accordance with its duties at and after termination, pursuant to Section 15.f, Heartland agreed in its license agreement to "promptly pay all sums then owed to [Baymont]." The unamortized portion of the L.I.S.A. System cost simply became one of the sums owed. Heartland's contention is merely that, because it was approaching its ten-year anniversary in 2006, it would constitute an expensive buy-out if it chose to terminate its franchise relationship, and thus it was unfair. However, it cannot and does not argue that the adoption of the L.I.S.A. System with its attendant costs was not anticipated and permitted by its agreement. Similarly, Heartland's contention that Baymont should have agreed to waive the unamortized portion of the cost is an argument without teeth inasmuch as Baymont did precisely what it was permitted to do under the agreement, and was entitled to payment of all sums then owed upon termination of the agreement.

- 6 -

In sum, Heartland's sole defense to the claim for breach of the license agreement rests upon the assertion that Baymont defaulted on the contract and caused Heartland's non-compliance.[5]  As we reject the contention that Baymont committed any breach of the agreement, we will grant summary judgment in favor of Baymont on its claim of liability.  The Adams offer no argument against the contention that their personal liability under the guaranty is governed and determined by Heartland's liability under the license agreement.  Summary judgment will therefore be granted as to the Fifth and Seventh Claims of the Complaint in favor of Baymont.  Additionally, Heartland does not deny that it received notice but did not takes the steps necessary to deimage its property until it was ordered to do so by this court.  Heartland does not even address the claim that it failed to return operation and policy manuals and other proprietary materials after termination of the agreement.  Summary judgment will be granted in favor of Baymont of the First, Second, Third and Fourth Claims of the Complaint.[6]  The matter of damages remains to be addressed.

A separate order will be entered this date in accordance with this opinion.

**IT IS SO ORDERED.**

---

[5] David Adams offers anecdotally in his supplemental declaration that Heartland was not unwilling to utilize the L.I.S.A. System, but then states that he "informed Higgs that Heartland would not begin using the L.I.S.A. system until we could reach an agreement with Baymont with respect to the cost of the system and Heartland's ability to exercise its right to terminate the License Agreement on the tenth anniversary of the opening date."  Adams further stated that "Heartland has been ready and willing to use L.I.S.A. provided that in doing so, it is not forced to waive its right to terminate the License Agreement in September of 2006."  Suppl. Decl., pp. 11, 13.  While stating its reasons for doing so, Adams has acknowledged that it did not comply with Baymont's requirements.  As Baymont had no obligation to negotiate terms with regard to the L.I.S.A. System, Adams' refusal to implement the L.I.S.A. System until it did so is a meritless argument.

[6] The Sixth Claim of the Complaint seeks declaratory relief against Heartland.  Again, Heartland has offered no argument against this claim.  To the extent that Baymont seeks a judicial determination of its right to terminate the license agreement, the claim has been addressed herein.  To the extent it seeks a declaration that Heartland has no further right to use the marks, the matter was addressed by earlier injunctive relief and may be further addressed, if necessary, in a final judgment.